## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**RANDALL THOMAS**,

      Plaintiff,

v.

**LIGHTHOUSE OF OAKLAND COUNTY**,
a Michigan non-profit corporation;
**LIGHTHOUSE COMMUNITY
DEVELOPMENT**, a Michigan non-profit
corporation; **GREG STERNS**, individually and
in his official capacity as Manager of Financial
Education and Counseling at Lighthouse
Community Development; **JOHN ZIRALDO**,
individually and in his official capacity as CEO
and President of Lighthouse of Oakland
County; **JUDITH ROBINSON**, individually
and in her official capacity as Executive
Director of Lighthouse Community
Development; **LATICE BOOKER**,
individually and in her official capacity as
Foreclosure Program Manager at Lighthouse
Community Development,

      Defendants.

Case No. 2:12-cv-15494
Hon. Victoria A. Roberts
Mag. Judge Michael J. Hluchaniuk

_____/

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Randall Thomas, through counsel, Bush Seyferth & Paige PLLC,

for his Complaint against Defendants Lighthouse of Oakland County ("LOC"),

Lighthouse Community Development ("LCD"), Greg Sterns, John Ziraldo, Judith

Robinson, and Latice Booker states as follows:

## NATURE OF CLAIMS

1.      This is an action for violations of federal and state law that prohibit discrimination in employment on the basis of disability, race, and sex; retaliation for exercising rights available under these laws; violation of the Family Medical Leave Act ("FMLA"); and common law intentional infliction of emotional distress ("IIED").

## PARTIES, JURISDICTION, AND VENUE

2.      Randall Thomas is a Michigan resident who resides within the Eastern District of Michigan.

3.      LOC is a non-profit corporation doing business in the Eastern District of Michigan.

4.      LCD, a wholly-owned subsidiary of LOC, is a non-profit corporation doing business in the Eastern District of Michigan.

5.      At all times relevant to this Complaint, Defendant Greg Sterns, a Michigan resident who resides within the Eastern District of Michigan, served as Manager of Financial Education and Counseling at LCD and, for at least part of that time, Mr. Thomas's supervisor.

6.      At all times relevant to this Complaint, Defendant John Ziraldo, a Michigan resident who resides within the Eastern District of Michigan, served as CEO and President of LOC and was either responsible or assumed responsibility

for making decisions concerning Mr. Thomas's employment, including but not limited to:

    a. The environment within which Mr. Thomas worked;

    b. Requests for accommodation of Mr. Thomas's disability;

    c. Mr. Thomas's entitlement to leave, either FMLA or non-FMLA; and

    d. Mr. Thomas's termination.

7.    At all times relevant to this Complaint, Defendant Judith Robinson, a Michigan resident who resides within the Eastern District of Michigan, served as Executive Director of LCD and, for at least part of that time, Mr. Thomas's supervisor.

8.    At all times relevant to this Complaint, Defendant Latice Booker, a Michigan resident who resides within the Eastern District of Michigan, served as Foreclosure Program Manager at LCD and, for at least part of that time, Mr. Thomas's supervisor.

9.    Mr. Thomas was "jointly employed" by Defendants LOC and LCD, *see e.g., EEOC v. Skanska USA Building, Inc.*, 550 F. App'x 253 (6th Cir. 2013), and Mr. Thomas's claims arise out his employment relationship with those entities.

10.    The Equal Employment Opportunity Commission ("EEOC") issued Mr. Thomas a "right to sue" letter on or about September 14, 2012.

11.    Mr. Thomas timely filed his initial Complaint with this Court on December 14, 2012.

12.    This Court has original jurisdiction over Mr. Thomas's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over his pendant state claims pursuant to 28 U.S.C. § 1367.

13.    Venue is proper because the events giving rise to Mr. Thomas's claims occurred in the Eastern District of Michigan and all parties reside within its borders.

## BACKGROUND FACTS

14.    Mr. Thomas, who is African-American, began his employment as a Senior Foreclosure Counselor for LCD on or about June 16, 2008.

15.    In this role, Mr. Thomas was primarily responsible for providing negotiating loan modifications for homeowners in the metro Detroit area.

16.    In connection with his employment, Mr. Thomas was expected to follow the policies and practices contained in LOC's Employee Manual.

17.    The Employee Manual establishes, among other terms and conditions of employment, the following policies:

    a.  Equal Employment Opportunity Policy;

    b.  Harassment Policy;

    c.  Attendance and Absenteeism Policy;

4

    d.  FMLA Policy; and

    e.  Separation from Employment Policy.

18.    Either prior to or shortly after commencing his employment, Mr. Thomas informed LOC and/or LCD in writing of his dyslexia.

19.    Either prior to or shortly after commencing his employment, Mr. Thomas provided LOC and/or LCD with a "Notice of Eligibility" letter from Michigan Rehabilitation Services, describing Mr. Thomas's eligibility for services to accommodate his dyslexia.

20.    Shortly after beginning his employment, Mr. Thomas orally informed Defendants Sterns, Robinson, and Booker that his dyslexia was causing him difficulty with typing and other documentation tasks, and he requested an accommodation, in particular, a computer software program with voice-to-text capabilities.

21.    Mr. Thomas suggested first to Karen Staley, Deputy Director of Lighthouse Community Development, and then to Judith Robinson that someone at LOC and/or LCD contact Michigan Rehabilitation Services as a possible avenue for procurement of such software.

22.    Curious whether LOC or LCD ever pursued his suggestion, Mr. Thomas contacted Michigan Rehabilitation Services and learned that they had not.

23.   Mr. Thomas's request for software with voice-to-text capabilities was not granted.

24.   Instead, Defendant Sterns assigned an employee to type Mr. Thomas's notes, which alleviated the difficulties that Mr. Thomas was experiencing with typing and other documentation tasks.

25.   At various times within his first year of employment, Mr. Thomas complained that he was shouldering many duties of his co-worker, Michelle Murphy, who was also a Senior Foreclosure Counselor  hired at approximately the same time as Mr. Thomas.

26.   Ms. Murphy was permitted to attend school two days per week during normal working hours and did not obtain certification from the Michigan State Housing Development Authority ("MSHDA"), as required for her position as Senior Foreclosure Counselor.

27.   Both because Ms. Murphy was not MSHDA-certified and because she was attending school, Mr. Thomas was forced to perform additional work that Ms. Murphy would have otherwise been responsible to perform.

28.   Upon information and belief, LOC or LCD paid Ms. Murphy the same wages as Mr. Thomas for the same level position, although Mr. Thomas was required to work significantly more than Ms. Murphy, including performing her

work, and he was not permitted the same opportunities as Ms. Murphy to pursue additional education on LOC's or LCD's time.

29.    Mr. Thomas complained about the additional work to Defendant Sterns, who told Mr. Thomas not to complain because "you can't even type your own notes."

30.    Mr. Thomas took Defendant Sterns's statement to mean that the accommodation would be removed if Mr. Thomas continued to complain about having to perform additional work that Ms. Murphy would have otherwise been responsible to perform.

31.    At some point, Defendant Booker became Mr. Thomas's supervisor.

32.    Mr. Thomas continued to raise his concerns to Ms. Booker about having to perform Ms. Murphy's work in addition to his own.

33.    Defendant Booker removed the accommodation that Defendant Sterns had put in place, requiring Mr. Thomas to type his notes without assistance.

34.    Thereafter, at Monday team meetings that were attended by many staff members and supervisors, Defendant Booker made negative comments about Mr. Thomas having poor typing skills and falling behind on his documentation tasks.

35.     When Defendant Booker made these comments at Monday team meetings, Mr. Thomas's coworkers and supervisors laughed, which made Mr. Thomas feel embarrassed and degraded.

36.     On February 2, 2010, Mr. Thomas was given a written warning with instruction to "immediately show sustained improvement in maintaining his activity log and submitting it to Latice Booker, Foreclosure Program Manager, by 12:00 p.m. the following Monday each week" and advising him that any further "failure of submitting activity logs or failure to comply with procedural policies may result in termination."

37.     This written warning was signed by Defendants Booker, Sterns, and Robinson.

38.     Also on this written warning, in the space reserved for "Employee Comments," Mr. Thomas explained:  "I'm dyslexic and have a very hard time work[ing] on new computer programs."

39.     In or about March 2010, Mr. Thomas became a Senior Housing Counselor for LCD; this was a lateral transfer with no change in wages and benefits.

40.     In this new role, Mr. Thomas reported directly to Defendant Sterns, and his duties included providing financial counseling to potential home owners,

reviewing financial orders and credit reports for home buyers,  providing advice to assist people to repair their credit and reduce their debt.

41.    Shortly after becoming Senior Housing Counselor, Mr. Thomas attended training in Ohio with Defendant Sterns and two other employees on how to use the new online data entry process.

42.    During the drive, Defendant Sterns called Mr. Thomas "dumb" and said he "didn't know anything" because he was "handicapped," apparently referring to Mr. Thomas's dyslexia.

43.    Defendant Sterns's comments made Mr. Thomas feel embarrassed and degraded in front of his colleagues because of his disability.

44.    Shortly after Mr. Thomas returned from training, Defendant Robinson went on vacation, during which time Defendant Sterns assumed her supervisory role over Mr. Thomas.

45.    One late afternoon during Defendant Robinson's absence, Defendant Sterns, who is Caucasian, appeared outside Mr. Thomas's office and, in the presence of other employees, referred to himself as Mr. Thomas's "slave master" and made a motion and a sound as if he were cracking a whip and told Mr. Thomas to "get back to work."  The other employees who witnessed this event then began to laugh.

46.     Extremely offended and upset by this incident, particularly because he is African-American, Mr. Thomas called Defendant Ziraldo the very next morning to report what happened.

47.     Defendant Ziraldo told Mr. Thomas that he would investigate.

48.     A few days later, in the process of looking for Defendant Sterns, Mr. Thomas learned that Defendant Sterns was in a meeting with Defendant Ziraldo.

49.     Defendant Sterns admitted to Defendant Ziraldo that he had used the term "slave driver."

50.     After meeting with Defendant Ziraldo, Defendant Sterns appeared at the door of Mr. Thomas's office and stared at him for an unusually long time in a threatening manner that made Mr. Thomas uncomfortable.

51.     As soon as Defendant Sterns left, Mr. Thomas called Defendant Ziraldo to report what happened and express his discomfort.

52.     Defendant Ziraldo told Mr. Thomas not to worry because he was investigating the matter.

53.     The very next morning, Defendant Sterns came into Mr. Thomas's office and said to Mr. Thomas, "Say good morning to your slave master."

54.     Mr. Thomas again called Defendant Ziraldo to report the incident.

55.    Later that same day, having heard about the racial comments, Defendant Robinson called Mr. Thomas while she was still on vacation and asked Mr. Thomas to try talking with Defendant Sterns to work out their differences.

56.    Mr. Thomas went into Defendant Sterns's office and told him that the "slave master" comments were upsetting, degrading, and embarrassing because it had become a major topic of discussion and rumors among other employees.

57.    Defendant Sterns, a former minister, told Mr. Thomas that he had "prayed to God" for guidance about "working with Blacks and Hispanics," but he did not apologize to Mr. Thomas.

58.    Following this conversation, Mr. Thomas called Defendant Robinson to tell her what Defendant Sterns had said about "praying to God."

59.    The next day, Defendant Sterns appeared outside Mr. Thomas's office and stared at him for a long period of time, again making Mr. Thomas feel very uncomfortable and threatened.

60.    Shortly thereafter, Mr. Thomas heard a rumor that LOC and/or LCD was considering firing him, and he suspected that this may have something to do with him reporting Defendant Sterns's racial comments and expressing discomfort in his work environment.

61.    Mr. Thomas approached his former supervisor, Defendant Booker, about the rumors and asked if she would talk to Defendant Sterns with him about

his racial comments and offensive and threatening behavior, but Defendant Booker declined.

62.     During this conversation with Defendant Booker about Mr. Thomas's complaints about a hostile work environment, Defendant Booker brought up the subject of Mr. Thomas's disability and expressed her view that Mr. Thomas "should be answering phones for minimum wage because he can't even read or write."

63.     Mr. Thomas reported Defendant Booker's comment to Defendant Ziraldo, who told Mr. Thomas not to worry about the comment because he did not report to Defendant Booker.

64.     On May, 17, 2010, Mr. Thomas filed his first charge of discrimination with the Michigan Department of Civil Rights (No. 413398).

65.     For a long time, the stress, discomfort, and embarrassment that Mr. Thomas was feeling at work had been mounting and, by May 17, 2010, the environment had become intolerable.  As a direct result of Defendants' wrongful conduct, Mr. Thomas suffered and continues to suffer from loss of sleep, anxiety, depression, and anger, among other negative effects.

66.     Mr. Thomas called in sick for the next few days and visited a doctor because he had become overwhelmingly distraught due to discriminatory comments at work and fear that he was going to lose his job.

67.     After visiting the doctor, Mr. Thomas informed LOC and/or LDC that he would be out sick until June 8, 2010.

68.     On June 9, 2010, Mr. Thomas provided a doctor's note stating that Mr. Thomas was totally disabled until August 2, 2010.

69.     Defendant Ziraldo asked Mr. Thomas if he would come back to work before August 2, 2010.

70.     In response, Mr. Thomas asked what specific disciplinary action had been taken against Defendants Booker and Sterns, but Defendant Ziraldo refused to tell him.

71.     Defendant Ziraldo told Mr. Thomas to "drop" his civil rights complaint "so we can move on."

72.     On or about July 20, 2014, LOC approved Mr. Thomas's request for FMLA leave for twelve weeks, beginning May 7, 2010.

73.     Defendant Ziraldo informed Mr. Thomas that he may be eligible for non-FMLA leave after his FMLA leave expired.

74.     Before his FMLA leave expired, Mr. Thomas provided LOC and/or LCD with a note from his physician, Dr. Leon Rubenfaer, stating that Mr. Thomas "is totally disabled from work" and providing a return-to-work date of "September 13, 2010."

75.   On July 30, 2010, Defendant Ziraldo stated in a letter to Mr. Thomas that Dr. Rubenfaer's "note does not provide us with sufficient information to determine whether additional leave will be granted" and asked Mr. Thomas to "have your doctor answer the questions in the attached form," to be returned "no later than August 9, 2010."

76.   A similar request was sent directly to Dr. Rubenfaer.

77.   Defendant Ziraldo received a fax from Dr. Rubenfaer on August 9, 2010, responding to LOC's inquiry regarding Mr. Thomas.

78.   Dissatisfied with Dr. Rubenfaer's answers, Defendant Ziraldo asked Dr. Rubenfaer to complete another form regarding Mr. Thomas by August 18, 2010.

79.   On August 16, 2010, Dr. Rubenfaer faxed Defendant Ziraldo the additional completed form, as requested.

80.   In this additional form, Dr. Rubenfaer explained that he had diagnosed Mr. Thomas with adjustment disorder with mixed features (depression and anxiety) and had determined him unstable and unable to complete a full day of work.

81.   In a letter dated August 23, 2010, Defendant Ziraldo informed Mr. Thomas that the results of the medical examination by doctor selected by LOC had found him fully able to perform his job.

82.    In this letter, Defendant Ziraldo invited Mr. Thomas "to return as soon as possible" and stated that he would "assume that you do not intend to return" if no response is provided "by the end of the week."

83.    Mr. Thomas responded by email the next day.  Mr. Thomas explained that, although interested in returning to work, he had remaining concerns that had not been addressed.

84.    A meeting was held on August 27, 2010, at which Defendants Ziraldo, Robinson, and Sterns pressured Mr. Thomas to return to work before September 13, 2010, contrary to the advice of Dr. Rubenfaer.

85.    Mr. Thomas stated that he might be able to return before September 13, 2010, but would require at least some additional time.

86.    Defendants Ziraldo, Robinson, and Sterns agreed to give Mr. Thomas "some time" and instructed him to keep Defendant Sterns informed.

87.    After the meeting when Mr. Thomas was directed to come back to work, Mr. Thomas talked to Defendant Sterns two to three times about Mr. Thomas making arrangements to return to work, but the issues were not fully resolved, as Mr. Thomas was still attempting to address child-care, medical, and other issues.  Mr. Sterns then stopped answering or returning Mr. Thomas's calls.

88.    As it turns out, Defendant Sterns had been on vacation when Mr. Thomas was trying to reach him.

89.     On September 7, 2010, because Mr. Thomas had not been able to reach Defendant Sterns, Mr. Thomas contacted Defendants Robinson and Ziraldo, who told Mr. Thomas that he should be in contact with Defendant Sterns before talking to them.

90.     On September 13, 2010, the date on which Dr. Rubenfaer had cleared him to return, Mr. Thomas reported to work but was informed that he had been fired.  Mr. Thomas subsequently learned from the EEOC that LOC informed it that Mr. Thomas had been fired on September 7, 2010.

91.     In addition, on the same day, Mr. Thomas was informed by the PATH daycare center, which is affiliated with LOC, that based on instructions from Defendant Ziraldo, Mr. Thomas could no longer bring his son to the daycare, even though the daycare services were not limited to the children of LOC or LCD employees, and Mr. Thomas was never informed previously that the daycare services were conditioned on or a specific benefit of his continued employment there.

92.     On September 15, 2010, Mr. Thomas was sent his termination letter, stating that, "as of September 7, 2010 you are no longer an employee of Lighthouse of Oakland County or any of its subsidiary organizations due to your failure to report to work or to provide a date by which you would return to work"

and citing "Lighthouse Policy 202," which provides that "[a]bsences for three consecutive days, without notification, shall be considered a resignation."

## COUNT I:
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

93.    Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 92 above as if set forth in full herein.

94.    At all times relevant to this Complaint, Mr. Thomas was an "employee," covered by and within the meaning of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*., as amended by the ADA Amendment Act of 2008.

95.    At all times relevant to this Complaint, Defendants LOC and LCD were Mr. Thomas's "employers," covered by and within the meaning of the ADA.

96.    Mr. Thomas's dyslexia is a physical or mental impairment that substantially limits one or more major life activities.

97.    Defendants LOC and LCD were aware of Mr. Thomas's dyslexia.

98.    Mr. Thomas's adjustment disorder with mixed features (anxiety and depression) is a physical or mental impairment that substantially limits one or more major life activities.

99.    Defendants LOC and LCD were aware of Mr. Thomas's adjustment disorder with mixed features (anxiety and depression).

100.   Mr. Thomas has a record of a physical or mental impairment that substantially limits one or more major life activities.

101.   Defendants LOC and LCD regarded Mr. Thomas as having a physical or mental impairment that substantially limits one or more major life activities.

102.   Mr. Thomas is a "qualified individual" within the meaning of the ADA.

103.   Mr. Thomas's disability and/or record of a disability and/or perceived disability was a factor that made a difference in Defendants LOC and LCD's decision to take adverse employment actions against Mr. Thomas, including but not limited to harassing him, subjecting him to a hostile work environment, subjecting him to different terms and conditions of employment, and ultimately terminating his employment.

104.   Defendants LOC and LCD failed to make reasonable accommodations to the known physical or mental limitations of Mr. Thomas.

105.   Defendants LOC and LCD were predisposed to discriminate on the basis of disability and/or record of a disability and/or perceived disability and acted in accordance with that predisposition in their treatment of Mr. Thomas.

106.   The actions of Defendants LOC and LCD were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Mr. Thomas.

107.   As a direct and proximate result of Defendant LOC and LCD's violation of Mr. Thomas's rights, the terms, conditions, and privileges of Mr. Thomas's employment were adversely affected.

108.   As a direct and proximate result of Defendants LOC and LCD's wrongful acts and omissions in violation of the ADA, Mr. Thomas has sustained injuries and damages including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT II:
## VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES ACT

109.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 108 above as if set forth in full herein.

110.   At all times relevant to this Complaint, Mr. Thomas was an "employee," covered by and within the meaning of Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), Mich. Comp. Laws § 37.1101 *et seq*.

111.   At all times relevant to this Complaint, Defendants LOC and LCD were Mr. Thomas's "employers," covered by and within the meaning of the PDCRA.

112.   Mr. Thomas's dyslexia and adjustment disorder with mixed features (anxiety and depression) constitute "disabilities" within the meaning of the PDCRA.

113.   Defendants LOC and LCD discriminated against Mr. Thomas by harassing him, subjecting him to a hostile work environment, subjecting him to different terms and conditions of employment, and ultimately terminating his employment because of his disability.

114.   Defendants LOC and LCD took these adverse actions against Mr. Thomas despite that a reasonable accommodation would have enabled Mr. Thomas to perform the specific requirements of his job.

115.   As a direct and proximate result of Defendants LOC and LCD's wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

**COUNT III:**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**BASED ON RACE DISCRIMINATION**

116.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 115 above as if set forth in full herein.

117.   At all times relevant to this Complaint, Mr. Thomas was an employee and Defendants LOC and LCD were his employers covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

118.   As an African-American, Mr. Thomas is a member of a protected class on the basis of his race.

119.   Defendants LOC and LCD's treatment of Mr. Thomas, as described above, was based, at least in part, on the unlawful consideration of his race.

120.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, were predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

121.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, treated similarly situated Caucasian employees more favorably than Plaintiff, in the terms, conditions, and benefits of employment.

122.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, created and/or maintained a hostile work environment for Mr. Thomas based, at least in part, on his race.

123.   The retaliatory and otherwise unlawful actions of Defendants LOC and LCD and its agents, representatives, and employees were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Mr. Thomas.

124.   As a direct and proximate result of Defendants LOC and LCD's wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

**COUNT III:**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**BASED ON SEX DISCRIMINATION**

125.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 124 above as if set forth in full herein.

126.   At all times relevant to this Complaint, Mr. Thomas was an employee and Defendants LOC and LCD were his employers covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

127.  Title VII of the Civil Rights Act of 1964 prohibits discrimination against employees on the basis of the employee's sex, and Mr. Thomas therefore is a member of a protected class on the basis of his sex.

128.  Defendants LOC and LCD's treatment of Mr. Thomas, as described above, was based, at least in part, on the unlawful consideration of his sex.

129.  Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, were predisposed to discriminate on the basis of sex and acted in accordance with that predisposition.

130.  Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, treated similarly situated female employees more favorably than Plaintiff, in the terms, conditions, and benefits of employment.

131.  Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, created and/or maintained a hostile work environment for Mr. Thomas based, at least in part, on his sex.

132.  The retaliatory and otherwise unlawful actions of Defendants LOC and LCD and its agents, representatives, and employees were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Mr. Thomas.

133.  As a direct and proximate result of Defendants LOC and LCD's wrongful acts and omissions, Mr. Thomas has sustained injuries and damages

including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT IV:
## VIOLATION OF MICHIGAN'S ELLIOT-LARSEN CIVIL RIGHTS ACT BASED ON RACE DISCRIMINATION

134.  Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 133 above as if set forth in full herein.

135.  At all times relevant to this Complaint, Mr. Thomas was an employee and Defendants LOC and LCD were his employers covered by and within the meaning of the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.22021 *et seq*.

136.  As an African-American, Mr. Thomas is a member of a protected class on the basis of his race.

137.  Defendants LOC and LCD's treatment of Mr. Thomas, as described above, was based, at least in part, on the unlawful consideration of his race.

138.  Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, were predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

139.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, treated similarly situated Caucasian employees more favorably than Mr. Thomas in the terms, conditions, and benefits of employment.

140.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, created and/or maintained a hostile work environment for Mr. Thomas based, at least in part, on his race.

141.   The retaliatory and otherwise unlawful actions of Defendants LOC and LCD and its agents, representatives, and employees were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Mr. Thomas.

142.   As a direct and proximate result of Defendants' wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:   (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

**COUNT IV:**
**VIOLATION OF MICHIGAN'S ELLIOT-LARSEN CIVIL RIGHTS ACT**
**BASED ON SEX DISCRIMINATION**

143.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 142 above as if set forth in full herein.

144.   At all times relevant to this Complaint, Mr. Thomas was an employee and Defendants LOC and LCD were his employers covered by and within the meaning of the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.22021 *et seq.*

145.   The Elliott-Larsen Civil Rights Act prohibits discrimination against employees on the basis of the employee's sex, and Mr. Thomas is therefore a member of a protected class on the basis of his sex.

146.   Defendants LOC and LCD's treatment of Mr. Thomas, as described above, was based, at least in part, on the unlawful consideration of his sex.

147.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, were predisposed to discriminate on the basis of sex and acted in accordance with that predisposition.

148.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, treated similarly situated female employees more favorably than Mr. Thomas in the terms, conditions, and benefits of employment.

149.   Defendants LOC and LCD, its agents, representatives, and employees, including Defendant Sterns, created and/or maintained a hostile work environment for Mr. Thomas based, at least in part, on his sex.

150.   The retaliatory and otherwise unlawful actions of Defendants LOC and LCD and its agents, representatives, and employees were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Mr. Thomas.

151.   As a direct and proximate result of Defendants' wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:   (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

### COUNT VI:
### UNLAWFUL RETALIATION

152.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 151 above as if set forth in full herein.

153.   Defendants LOC and LCD, through their employees and agents, retaliated against Mr. Thomas for having complained about the discriminatory

employment practices described above, in violation of both Title VII of the Civil Rights Act of 1964 and the Elliot-Larsen Civil Rights Act.

154.   Defendants' actions were intentional or undertaken with reckless indifference to Mr. Thomas's rights and sensibilities.

155.   As a direct and proximate result of Defendants' wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:   (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT V:
## VIOLATION OF THE FAMILY MEDICAL LEAVE ACT

156.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 155 above as if set forth in full herein.

157.   Defendants LOC and LCD are employers covered by the FMLA, 29 U.S.C. § 2601 *et seq.*

158.   Mr. Thomas was entitled to and granted leave under the FMLA.

159.   During Mr. Thomas's FMLA leave, and despite that Mr. Thomas had provided a doctor's note stating that Mr. Thomas was totally disabled until August

2, 2010, Defendant Ziraldo pressured Plaintiff to return to work before August 2, 2010.

160.   This pressure by Defendant Ziraldo, an agent of LOC and LCD, impeded Mr. Thomas's FMLA rights, including but not limited to the right to be free from threats and harassment for exercising his rights under the law.

161.   Defendants LOC, LCD, and Ziraldo's retaliatory and otherwise unlawful actions were intentional, with deliberate disregard for the rights and sensibilities of Mr. Thomas.

162.   As a direct and proximate result of these wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT VI:
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

163.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 162 above as if set forth in full herein.

164.   Defendants Sterns, Ziraldo, Robinson, and Booker engaged in outrageous conduct toward Mr. Thomas, with the intention to cause or with

reckless disregard for the probability of causing Mr. Thomas to suffer severe emotional distress.

165.   Defendant Sterns's reference to himself as Mr. Thomas's "slave master" and motion of cracking a whip are extraordinary transgressions outside the bounds of socially tolerable conduct.

166.   Defendants LOC and LCD adopted and ratified this outrageous conduct with a wanton and reckless disregard of the deleterious consequences suffered by Mr. Thomas.

167.   This outrageous conduct was committed maliciously, with the intent to injure Mr. Thomas, and in conscious disregard of his rights.

168.   As a direct and proximate result of this and other outrageous conduct described above, Mr. Thomas has suffered and continues to suffer extreme mental distress, humiliation, anguish, emotional and physical injuries, and economic losses.

## **RELIEF REQUESTED**

For the reasons above, Plaintiff Randall Thomas seeks a judgment against Defendants as follows:

I.   Legal Relief

A.   Compensatory damages in whatever amount he is found to be entitled;

      B.     Exemplary and punitive damages in whatever amount he is found to be entitled; and

      C.     Lost wages and benefits, past and future, in whatever amount he is found to be entitled;

II.    <u>Equitable Relief</u>

      A.     An order reinstating Mr. Thomas to the position he would have held had there been no discrimination;

      B.     An injunction prohibiting further acts of discrimination;

      C.     Other equitable relief that this Court deems just and appropriate at the time of final judgment.

                       BUSH SEYFERTH & PAIGE PLLC
                       Attorneys for Plaintiff

                       By:    <u>/s/Jessica R. Vartanian _____</u>
                              Moheeb H. Murray (P63893)
                              Jessica R. Vartanian (P74213)
                              Bush Seyferth & Paige PLLC
                              Attorneys for Plaintiff
                              3001 W. Big Beaver Road, Ste. 600
                              Troy, MI  48084
                              (248) 822-7800

Dated:    September 19, 2014

## **JURY DEMAND**

Plaintiff Randall Thomas, through counsel, Bush Seyferth & Paige PLLC, demands a jury trial on all issues so triable.

BUSH SEYFERTH & PAIGE PLLC
Attorneys for Plaintiff

By:   /s/Jessica R. Vartanian_____
      Jessica R. Vartanian (P74213)
      Moheeb H. Murray (P63893)
      Bush Seyferth & Paige PLLC
      Attorneys for Plaintiff
      3001 W. Big Beaver Road, Ste. 600
      Troy, MI  48084
      (248) 822-7800

Dated:    September 19, 2014