## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**RANDALL THOMAS,**

      Plaintiff,

v.

**LIGHTHOUSE OF OAKLAND COUNTY,**
a Michigan non-profit corporation;
**LIGHTHOUSE COMMUNITY
DEVELOPMENT,** a Michigan non-profit
corporation; **GREG STERNS,** individually and
in his official capacity as Manager of Financial
Education and Counseling at Lighthouse
Community Development; and **JOHN
ZIRALDO,** individually and in his official
capacity as CEO and President of Lighthouse of
Oakland County,

      Defendants.

Case No. 2:12-cv-15494
Hon. Victoria A. Roberts
Mag. Judge Michael J. Hluchaniuk

_____/

### SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Randall Thomas, through counsel, Bush Seyferth & Paige PLLC,

for his Second Amended Complaint against Defendants Lighthouse of Oakland

County ("LOC"), Lighthouse Community Development ("LCD"), Greg Sterns, and

John Ziraldo, states as follows:

### NATURE OF CLAIMS

1.    This is an action for violations of federal and state law that prohibit

discrimination in employment on the basis of disability and race; retaliation for

exercising rights available under these laws; violation of the Family Medical Leave Act ("FMLA"); and common law intentional infliction of emotional distress ("IIED").

## PARTIES, JURISDICTION, AND VENUE

2.     Randall Thomas is a Michigan resident who resides within the Eastern District of Michigan.

3.     LOC is a non-profit corporation doing business in the Eastern District of Michigan.

4.     LCD, a wholly-owned subsidiary of LOC, is a non-profit corporation doing business in the Eastern District of Michigan.

5.     At all times relevant to this Complaint, Defendant Greg Sterns, a Michigan resident who resides within the Eastern District of Michigan, served as Manager of Financial Education and Counseling at LCD and, for at least part of that time, Mr. Thomas's supervisor.

6.     At all times relevant to this Complaint, Defendant John Ziraldo, a Michigan resident who resides within the Eastern District of Michigan, served as CEO and President of LOC.

7.     Defendant Ziraldo was either responsible for, or assumed responsibility for, making decisions concerning Mr. Thomas's employment, including but not limited to:

a.  The environment within which Mr. Thomas worked;

b.  Requests for accommodation of Mr. Thomas's disability;

c.  Mr. Thomas's entitlement to leave, either FMLA or non-FMLA; and

d.  Mr. Thomas's termination.

8.     Mr. Thomas was "jointly employed" by Defendants LOC and LCD, *see e.g.*, *EEOC v. Skanska USA Building, Inc.*, 550 F. App'x 253 (6th Cir. 2013), and Mr. Thomas's claims arise out of his employment relationship with those entities.

9.     On December 27, 2010, Mr. Thomas filed a Charge of Discrimination with the Michigan Department of Civil Rights ("MDCR") and the Equal Employment Opportunity Commission ("EEOC"), MDCR #420446 and EEOC #23A-2011-00419C.

10.    With respect to the above Charge, the EEOC issued Mr. Thomas a "right to sue" notice on or about September 14, 2012, but it was returned to sender.

11.    Had the notice been successfully delivered, Mr. Thomas would have received it, at the very earliest, on September 15, 2012.

12.    On October 25, 2012, the EEOC re-sent Mr. Thomas's "right to sue" notice, instructing him to file suit, if at all, by "mid December."

13.    Mr. Thomas timely filed his initial Complaint with this Court on December 14, 2012. *See* 42 U.S.C. § 200e-5(f)(1); 29 C.F.R. § 1601.28(e).

14.    This Court has original jurisdiction over Mr. Thomas's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over his pendant state claims pursuant to 28 U.S.C. § 1367.

15.    Venue is proper because the events giving rise to Mr. Thomas's claims occurred in the Eastern District of Michigan and all parties reside within its borders.

## BACKGROUND FACTS

16.    Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 15 above as if stated in full herein.

17.    Mr. Thomas, who is African-American, began his employment as a Senior Foreclosure Counselor for LCD on or about June 16, 2008.

18.    In this role, Mr. Thomas was primarily responsible for providing and negotiating loan modifications for homeowners in the metro Detroit area.

19.    In connection with his employment, Mr. Thomas was expected to follow the policies and practices contained in LOC's Employee Manual.

20.    LOC's Employee Manual establishes, among other terms and conditions of employment, the following policies:

   a. Equal Employment Opportunity Policy;

   b. Harassment Policy;

   c. Attendance and Absenteeism Policy;

    d.  FMLA Policy; and

    e.  Separation from Employment Policy.

21.    Either prior to or shortly after commencing his employment, Mr. Thomas informed LOC, LCD, or an agent of LOC or LCD of his dyslexia.

22.    Either prior to or shortly after commencing his employment, Mr. Thomas provided LOC, LCD, or an agent of LOC or LCD with a "Notice of Eligibility" letter from Michigan Rehabilitation Services, describing Mr. Thomas's eligibility for services including development of an Individualized Plan for Employment ("IPE").

23.    Shortly after beginning his employment, Mr. Thomas orally informed LOC, LCD, or an agent of LOC or LCD that his dyslexia was causing him difficulty with typing and other documentation tasks, and he requested an accommodation, in particular, a computer software program with voice-to-text capabilities.

24.    Mr. Thomas suggested, first to Karen Staley, Deputy Director of LCD, and then to Judith Robinson, Executive Director of LCD, that someone at LOC or LCD contact Michigan Rehabilitation Services as a possible avenue for procurement of such software.

25.    Curious whether LOC or LCD ever pursued his suggestion, Mr. Thomas contacted Michigan Rehabilitation Services and learned that they had not.

26. Mr. Thomas's request for software with voice-to-text capabilities was not granted.

27. Instead, Defendant Sterns assigned an employee to type Mr. Thomas's notes.

28. This accommodation alleviated the difficulties that Mr. Thomas was experiencing with typing and other documentation tasks.

29. At various times within his first year of employment, Mr. Thomas complained that he was shouldering many duties of his co-worker, Michelle Murphy, who was also a Senior Foreclosure Counselor hired at approximately the same time as Mr. Thomas.

30. Ms. Murphy was permitted to attend school two days per week during normal working hours and did not obtain certification from the Michigan State Housing Development Authority ("MSHDA"), as required for her position as Senior Foreclosure Counselor.

31. Both because Ms. Murphy was not MSHDA-certified and because she was attending school, Mr. Thomas was forced to perform additional work that Ms. Murphy would have otherwise been responsible to perform.

32. Upon information and belief, LOC or LCD paid Ms. Murphy the same wages as Mr. Thomas for the same level position, although Mr. Thomas was required to work significantly more than Ms. Murphy, including performing her

work, and he was not permitted the same opportunities as Ms. Murphy to pursue additional education on LOC's or LCD's time.

33.    Mr. Thomas complained about the additional work to Defendant Sterns, who told Mr. Thomas not to complain because "you can't even type your own notes."

34.    Mr. Thomas took Defendant Sterns's statement to mean that the accommodation would be removed if Mr. Thomas continued to complain about having to perform additional work that Ms. Murphy would have otherwise been responsible to perform.

35.    At some point, Latice Booker, Foreclosure Program Manager at LCD, became Mr. Thomas's supervisor.

36.    Ms. Booker removed the accommodation that Defendant Sterns had put in place, requiring Mr. Thomas to type his notes without assistance.

37.    Thereafter, at Monday team meetings that were attended by many staff members and supervisors, Ms. Booker made negative comments about Mr. Thomas having poor typing skills and falling behind on his documentation tasks.

38.    When Ms. Booker made these comments at Monday team meetings, Mr. Thomas's coworkers and supervisors laughed, which made Mr. Thomas feel embarrassed and degraded.

39.    On February 2, 2010, Mr. Thomas was given a written warning with instruction to "immediately show sustained improvement in maintaining his activity log and submitting it to Latice Booker, Foreclosure Program Manager, by 12:00 p.m. the following Monday each week" and advising him that any further "failure of submitting activity logs or failure to comply with procedural policies may result in termination."

40.    This written warning was signed by Ms. Booker, Ms. Robinson, and Defendant Sterns.

41.    On this written warning, in the space reserved for "Employee Comments," Mr. Thomas explained:  "I'm dyslexic and have a very hard time work[ing] on new computer programs."

42.    In March 2010, Mr. Thomas became a Senior Housing Counselor for LCD; this was a lateral transfer with no change in wages and benefits.

43.    In this new role, Mr. Thomas reported directly to Defendant Sterns, and his duties included providing financial counseling to potential home owners, reviewing financial orders and credit reports for home buyers, providing advice to assist people to repair their credit and reduce their debt.

44.    Shortly after becoming Senior Housing Counselor, Mr. Thomas attended training in Ohio with Defendant Sterns and two other employees on how to use the new online data entry process.

45.     During the drive, Defendant Sterns called Mr. Thomas "dumb" and said he "didn't know anything" because he was "handicapped," apparently referring to Mr. Thomas's dyslexia.

46.     Defendant Sterns's comments made Mr. Thomas feel embarrassed and degraded in front of his colleagues because of his disability.

47.     Shortly after Mr. Thomas returned from training, Ms. Robinson went on vacation, during which time Defendant Sterns assumed her supervisory role.

48.     One late afternoon during Ms. Robinson's absence, Defendant Sterns, who is Caucasian, appeared outside Mr. Thomas's office and, in the presence of other employees, referred to himself as Mr. Thomas's "slave master," made a motion and sound as if he were cracking a whip, and told Mr. Thomas to "get back to work." The other employees who witnessed this event laughed.

49.     Extremely offended and upset by this incident, particularly because he is African-American, Mr. Thomas called Defendant Ziraldo the next morning to report what had happened.

50.     Defendant Ziraldo told Mr. Thomas that he would investigate.

51.     A few days later, in the process of looking for Defendant Sterns, Mr. Thomas learned that Defendant Sterns was in a meeting with Defendant Ziraldo.

52.     Defendant Sterns admitted to Defendant Ziraldo that he had used the term "slave driver."

53.     After meeting with Defendant Ziraldo, Defendant Sterns appeared at the door of Mr. Thomas's office and stared at him for an unusually long time in a threatening manner that made Mr. Thomas uncomfortable.

54.     As soon as Defendant Sterns left, Mr. Thomas called Defendant Ziraldo to report what happened and express his discomfort.

55.     Defendant Ziraldo told Mr. Thomas not to worry because he was investigating the matter.

56.     The next morning, Defendant Sterns came into Mr. Thomas's office and said to Mr. Thomas, "Say good morning to your slave master."

57.     Mr. Thomas again called Defendant Ziraldo to report the incident.

58.     Later that same day, having heard about the racial comments, Ms. Robinson called Mr. Thomas while on vacation and asked Mr. Thomas to try talking with Defendant Sterns to work out their differences.

59.     Mr. Thomas went into Defendant Sterns's office and told him that the "slave master" comments were upsetting, degrading, and embarrassing.

60.     Defendant Sterns, a former minister, told Mr. Thomas that he had "prayed to God" for guidance about "working with Blacks and Hispanics," but he did not apologize to Mr. Thomas.

61.     Following this conversation, Mr. Thomas called Ms. Robinson to tell her what Defendant Sterns had said about having "prayed to God."

62.     The next day, Defendant Sterns appeared outside Mr. Thomas's office and stared at him for a long period of time, again making Mr. Thomas feel very uncomfortable and threatened.

63.     Shortly thereafter, Mr. Thomas heard a rumor that LOC or LCD was considering firing him, and he suspected that this may have something to do with him reporting Defendant Sterns's racial comments and expressing discomfort in his work environment.

64.     Mr. Thomas approached his former supervisor, Ms. Booker, about the rumors and asked if she would participate in a conversation with Defendant Sterns and him about the racial comments and threatening behavior, but Ms. Booker declined.

65.     During this conversation with Ms. Booker about the racial comments and threatening behavior, Ms. Booker brought up the subject of Mr. Thomas's disability and expressed her view that Mr. Thomas "should be answering phones for minimum wage because he can't even read or write."

66.     Mr. Thomas reported Ms. Booker's comment to Defendant Ziraldo, who told Mr. Thomas not to worry about the comment because he did not report to Ms. Booker.

67.     On May, 17, 2010, Mr. Thomas filed his first Charge of Discrimination with the MDCR and EEOC, MDCR #413398 and EEOC #23A-

2010-01018C, alleging that he had "been subjected to unequal terms and conditions of employment because of my race and disability."

68.    By this point, the stress, discomfort, and embarrassment that Mr. Thomas had been feeling at work had become intolerable.

69.    Mr. Thomas called in sick for the next few days and visited a doctor because he had become overwhelmingly distraught due to discriminatory comments and behavior at work and fear that he was going to lose his job.

70.    After visiting the doctor, Mr. Thomas informed LOC or LDC that he would be out sick until June 8, 2010.

71.    On June 9, 2010, Mr. Thomas provided LOC or LCD with a doctor's note stating that Mr. Thomas was totally disabled until August 2, 2010.

72.    Defendant Ziraldo asked Mr. Thomas if he would come back to work before August 2, 2010.

73.    In response, Mr. Thomas asked what specific disciplinary action had been taken against Ms. Booker and Defendant Sterns, but Defendant Ziraldo refused to tell him.

74.    Defendant Ziraldo told Mr. Thomas to "drop" his civil rights complaint "so we can move on."

75.    On or about July 20, 2010, LOC or LCD approved Mr. Thomas's request for FMLA leave for twelve weeks, retroactively beginning on May 7, 2010.

76.    Defendant Ziraldo informed Mr. Thomas that he may be eligible for non-FMLA leave after his FMLA leave expired.

77.    Before his FMLA leave expired, Mr. Thomas provided LOC or LCD with a note from his physician, Dr. Leon Rubenfaer, stating that Mr. Thomas "is totally disabled from work" and providing a return-to-work date of "September 13, 2010."

78.    On July 30, 2010, Defendant Ziraldo stated in a letter to Mr. Thomas that Dr. Rubenfaer's "note does not provide us with sufficient information to determine whether additional leave will be granted" and asked Mr. Thomas to "have your doctor answer the questions in the attached form," to be returned "no later than August 9, 2010."

79.    A similar request was sent directly to Dr. Rubenfaer.

80.    Defendant Ziraldo received a fax from Dr. Rubenfaer on August 9, 2010, responding to LOC's inquiry regarding Mr. Thomas.

81.    Dissatisfied with Dr. Rubenfaer's answers, Defendant Ziraldo asked Dr. Rubenfaer to complete and return another form regarding Mr. Thomas by August 18, 2010.

82.    On August 16, 2010, Dr. Rubenfaer faxed Defendant Ziraldo the additional completed form, as requested.

83.   In this additional form, Dr. Rubenfaer explained that he had diagnosed Mr. Thomas's condition as adjustment disorder with mixed features (depression and anxiety) and had determined him unstable and unable to complete a full day of work.

84.   Meanwhile, Dr. Harvey Ager, selected through LOC and LCD's Workers' Compensation Disability claim insurer, examined Mr. Thomas on July 20, 2010.

85.   In a letter dated August 23, 2010, Defendant Ziraldo informed Mr. Thomas that the results of the medical examination by Dr. Ager had found him fully able to perform his job.

86.   In this letter, Defendant Ziraldo invited Mr. Thomas "to return as soon as possible" and stated that he would "assume that you do not intend to return" if no response is provided "by the end of the week."

87.   Mr. Thomas responded by email the next day.  Mr. Thomas explained that, although interested in returning to work, he had remaining concerns that had not been addressed.

88.   A meeting was held on August 27, 2010, during which Defendant Ziraldo, Defendant Sterns, and Ms. Robinson pressured Mr. Thomas to return to work before September 13, 2010, contrary to the return-to-work date prescribed by Dr. Rubenfaer.

89.   Mr. Thomas stated that he might be able to return before September 13, 2010, but would require at least some additional time.

90.   Defendant Ziraldo, Defendant Sterns, and Ms. Robinson agreed to give Mr. Thomas "some time" and instructed him to keep Defendant Sterns informed.

91.   After this meeting, Mr. Thomas talked to Defendant Sterns two to three times about Mr. Thomas making arrangements to return to work, but the issues were not fully resolved, as Mr. Thomas was still sorting out child-care, medical, and other issues.  Defendant Sterns then stopped answering or returning Mr. Thomas's calls.

92.   As it turns out, Defendant Sterns had been on vacation when Mr. Thomas was trying to reach him.

93.   On September 7, 2010, because Mr. Thomas had not been able to reach Defendant Sterns, Mr. Thomas contacted Defendant Ziraldo and Ms. Robinson, who told Mr. Thomas that he should be in contact with Defendant Sterns before talking to them.

94.   On September 13, 2010, the date on which Dr. Rubenfaer had cleared Mr. Thomas to return to work, Mr. Thomas reported to work but was informed that he had been fired.

95.   Defendant Ziraldo later told Mr. Thomas that he was not being brought back because he had not dropped his civil rights complaint.

96.   Earlier that morning, PATH daycare center, which is affiliated with LOC, informed Mr. Thomas, based on an instruction from Defendant Ziraldo, that Mr. Thomas could no longer bring his son to the daycare; consequently, Mr. Thomas reported to work with his son.

97.   The daycare services offered by PATH are not limited to the children of LOC or LCD employees, and Mr. Thomas is unaware of any basis for Defendant Ziraldo to have instructed PATH not to offer daycare services to Mr. Thomas for his son.

98.   On September 15, 2010, Mr. Thomas was sent his termination letter, stating that, "as of September 7, 2010 you are no longer an employee of Lighthouse of Oakland County or any of its subsidiary organizations due to your failure to report to work or to provide a date by which you would return to work" and citing "Lighthouse Policy 202," which provides that "[a]bsences for three consecutive days, without notification, shall be considered a resignation."

99.   Mr. Thomas was never contacted on September 7, 2010, the alleged date of his termination; he was first informed that he was terminated on September 13, 2010.

100.   On December 27, 2010, Mr. Thomas filed his second Charge of Discrimination, MDCR #420446 and EEOC #23A-2011-00419C, alleging that he was terminated "because of his race and disability and in retaliation for filing a previous civil rights complaint."

101.   With regard to this Charge, the EEOC issued Mr. Thomas a "right to sue" notice on or about September 14, 2012, but it was returned to sender.

102.   Had the notice been successfully delivered, Mr. Thomas would have received it, at the very earliest, on September 15, 2012.

103.   On October 25, 2012, the EEOC re-sent Mr. Thomas's "right to sue" notice.   Although the letter states that the 90-day window for filing a lawsuit in federal district court runs from the "date of receipt" of such notice by the charging party, the letter nonetheless instructed Mr. Thomas to file suit by "mid December."

104.   Mr. Thomas filed his initial Complaint with this Court on December 14, 2012.

## COUNT I:
## VIOLATION OF THE AMERICANS WITH DISABILITIES
## ACT BY LOC AND LCD

105.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 104 above as if set forth in full herein.

106.   At all times relevant to this Complaint, Mr. Thomas was an "employee," covered by and within the meaning of the Americans with Disabilities

Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, as amended by the ADA Amendment Act of 2008.

107.   At all times relevant to this Complaint, LOC and LCD were Mr. Thomas's "employers," covered by and within the meaning of the ADA.

108.   Mr. Thomas's dyslexia is a physical or mental impairment that substantially limits one or more major life activities.

109.   LOC and LCD were aware of Mr. Thomas's dyslexia.

110.   Mr. Thomas's adjustment disorder with mixed features (anxiety and depression) is a physical or mental impairment that substantially limits one or more major life activities.

111.   LOC and LCD were aware of Mr. Thomas's adjustment disorder with mixed features (anxiety and depression).

112.   Mr. Thomas is a "qualified individual" within the meaning of the ADA because he can perform the essential functions of a Senior Housing Counselor for LCD, with or without reasonable accommodation.

113.   LOC and LCD failed to make reasonable accommodations to the known physical or mental limitations of Mr. Thomas, including but not limited to the provision of a computer software program with voice-to-text capabilities, assistance with typing and other documentation tasks, and leave time as prescribed by Mr. Thomas's treating physician.

114. Mr. Thomas's disability made a difference in LOC and LCD's decision to terminate his employment.

115. LOC and LCD had no legitimate, non-discriminatory reason to terminate Mr. Thomas.

116. LOC and LCD's decision to terminate Mr. Thomas was in retaliation for having complained about, and filed a civil rights charge regarding, the discriminatory employment practices described above, in violation of the ADA.

117. The actions of LOC and LCD were intentional and willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of Mr. Thomas.

118. As a direct and proximate result of these wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to: (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT II:
## VIOLATION OF THE MICHIGAN PERSONS WITH
## <u>DISABILITIES ACT BY LOC AND LCD</u>

119.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 118 above as if set forth in full herein.

120.   At all times relevant to this Complaint, Mr. Thomas was an "employee," covered by and within the meaning of Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), Mich. Comp. Laws § 37.1101 *et seq.*

121.   At all times relevant to this Complaint, LOC and LCD were Mr. Thomas's "employers," covered by and within the meaning of the PDCRA.

122.   Mr. Thomas's dyslexia and adjustment disorder with mixed features (anxiety and depression) constitute "disabilities" within the meaning of the PDCRA.

123.   LOC and LCD terminated Mr. Thomas despite that reasonable accommodation, including but not limited to the provision of a computer software program with voice-to-text capabilities, assistance with typing and other documentation tasks, and leave time as prescribed by Mr. Thomas's treating physician, would have enabled Mr. Thomas to perform the essential requirements of his job.

124.   Mr. Thomas's disability made a difference in LOC and LCD's decision to terminate his employment.

125. LOC and LCD had no legitimate, non-discriminatory reason to terminate Mr. Thomas.

126. LOC and LCD's decision to terminate Mr. Thomas was in retaliation for having complained about, and filed a civil rights charge regarding, the discriminatory employment practices described above, in violation of the PDCRA.

127. The actions of LOC and LCD were intentional and willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of Mr. Thomas.

128. As a direct and proximate result of these wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to: (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT III:
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS
## ACT OF 1964 ON THE BASIS OF RACE BY LOC AND LCD

129. Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 128 above as if set forth in full herein.

130.   At all times relevant to this Complaint, Mr. Thomas was an employee and LOC and LCD were his employers covered by and within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.

131.   As an African-American, Mr. Thomas is a member of a protected class on the basis of his race.

132.   LOC and LCD's termination of Mr. Thomas was based, at least in part, on the unlawful consideration of his race.

133.   LOC and LCD were predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

134.   LOC and LCD's decision to terminate Mr. Thomas was in retaliation for having complained about, and filed a civil rights charge regarding, the discriminatory employment practices described above, in violation of Title VII.

135.   LOC and LCD's unlawful actions were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Mr. Thomas.

136.   As a direct and proximate result of these wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation;

and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT IV:
## VIOLATION OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT ON THE BASIS OF RACE BY LOC, LCD, AND DEFENDANT ZIRALDO

137.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 136 above as if set forth in full herein.

138.   At all times relevant to this Complaint, Mr. Thomas was an employee and LOC and LCD were his employers covered by and within the meaning of the Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2201 *et seq.*

139.   Defendant Ziraldo likewise falls within the definition of "employer" under the ELCRA.  Mich. Comp. Laws § 37.2201(a) (defining employer to include "an agent").

140.   As an African-American, Mr. Thomas is a member of a protected class on the basis of his race.

141.   LOC, LCD, and Defendant Ziraldo's decision to terminate Mr. Thomas was based, at least in part, on the unlawful consideration of his race.

142.   LOC, LCD, and Defendant Ziraldo were predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

143.   LOC, LCD, and Defendant Ziraldo retaliated against Mr. Thomas for having complained about, and filed civil rights charges regarding, the discriminatory employment practices described above, in violation of the ELCRA.

144.   The retaliatory and otherwise unlawful actions of LOC, LCD, and Defendant Ziraldo were intentional and willful, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Mr. Thomas.

145.   As a direct and proximate result of these wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT V:
## VIOLATION OF THE FAMILY MEDICAL LEAVE ACT
## BY LOC AND LCD

146.   Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 145 above as if set forth in full herein.

147.   Defendants LOC and LCD are employers covered by the FMLA, 29 U.S.C. § 2601 *et seq.*

148.   Mr. Thomas was entitled to and granted leave under the FMLA.

149.   During Mr. Thomas's FMLA leave, and despite that Mr. Thomas had provided a doctor's note stating that Mr. Thomas was totally disabled until August 2, 2010, Defendant Ziraldo pressured Plaintiff to return to work before August 2, 2010.

150.   This pressure by Defendant Ziraldo, an agent of LOC and LCD, impeded Mr. Thomas's FMLA rights, including but not limited to the right to be free from threats and harassment for exercising his rights under the law.

151.   LOC, LCD, and Defendant Ziraldo's retaliatory and otherwise unlawful actions were intentional, with deliberate disregard for the rights and sensibilities of Mr. Thomas.   *See* 29 U.S.C. § 2617(c)(2) (providing a three-year statute of limitations for willful violations).

152.   As a direct and proximate result of these wrongful acts and omissions, Mr. Thomas has sustained injuries and damages including but not limited to:  (1) loss of earnings and earning capacity; (2) loss of career opportunities; (3) loss of fringe and pension benefits; (4) mental anguish; (5) physical and emotional distress; (6) humiliation and embarrassment; (7) loss of professional reputation; and (8) loss of the ordinary pleasures of everyday life, including the right to pursue the gainful employment of his choice.

## COUNT VI:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## <u>BY DEFENDANT STERNS</u>

153.  Mr. Thomas repeats and realleges the allegations set forth in paragraphs 1 through 152 above as if set forth in full herein.

154.  Defendant Sterns engaged in outrageous conduct toward Mr. Thomas, with the intention to cause or with reckless disregard for the probability of causing Mr. Thomas to suffer severe emotional distress.

155.  For example, Defendant Sterns's reference to himself as Mr. Thomas's "slave master" and the motion of cracking a whip are extraordinary transgressions outside the bounds of socially tolerable conduct.

156.  This and other outrageous conduct was committed maliciously, with the intent to injure Mr. Thomas, and in conscious disregard of his rights.

157.  As a direct and proximate result of Defendant Sterns's outrageous conduct, as described above, Mr. Thomas has suffered and continues to suffer extreme mental distress, humiliation, anguish, emotional and physical injuries, and economic losses.

## <u>RELIEF REQUESTED</u>

For the reasons above, Plaintiff Randall Thomas seeks a judgment against Defendants as follows:

I.      Legal Relief

    A.      Compensatory damages in whatever amount he is found to be entitled;

    B.      Exemplary and punitive damages in whatever amount he is found to be entitled; and

    C.      Lost wages and benefits, past and future, in whatever amount he is found to be entitled;

II.     Equitable Relief

    A.      An order reinstating Mr. Thomas to the position he would have held had there been no discrimination;

    B.      An injunction prohibiting further acts of discrimination;

    C.      Other equitable relief that this Court deems just and appropriate at the time of final judgment.

<div align="right">

BUSH SEYFERTH & PAIGE PLLC
Attorneys for Plaintiff

By:   /s/Jessica R. Vartanian
      Moheeb H. Murray (P63893)
      Jessica R. Vartanian (P74213)
      Bush Seyferth & Paige PLLC
      Attorneys for Plaintiff
      3001 W. Big Beaver Road, Ste. 600
      Troy, MI  48084
      (248) 822-7800

</div>

Dated:     December 23, 2014

## **JURY DEMAND**

Plaintiff Randall Thomas, through counsel, Bush Seyferth & Paige PLLC,

demands a jury trial on all issues so triable.

<div style="margin-left: 40%;">

BUSH SEYFERTH & PAIGE PLLC
Attorneys for Plaintiff

By:   /s/Jessica R. Vartanian
       Jessica R. Vartanian (P74213)
       Moheeb H. Murray (P63893)
       Bush Seyferth & Paige PLLC
       Attorneys for Plaintiff
       3001 W. Big Beaver Road, Ste. 600
       Troy, MI 48084
       (248) 822-7800

</div>

Dated:    December 23, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on I caused to be electronically filed the above document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

<div align="right">

By:/s/ Jessica R. Vartanian
Jessica R. Vartanian (P74213)

</div>